1
2
3
4
5
6

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

7
8
9
10
11
12

| HYBRID INTERNATIONAL, LLC, | Case No. 2:19-CV-2077 JCM (EJY) |
| Plaintiff(s), | ORDER |
| v. | |
| SCOTIA INTERNATIONAL OF NEVADA, INC., | |
| Defendant(s). | |

13
14
15
16
17
18

Presently before the court are plaintiffs/counter-defendants Hybrid International, LLC, and Johnathan Schultz's (collectively "plaintiffs") motion to strike (ECF No. 98) and motion for summary judgment (ECF No. 85). Defendants/counterclaimants Scotia International of Nevada, Inc. ("Scotia"), and Warren Barber and Max Barber (the "Barbers") (collectively, "defendants") have not responded to either motion, and the time to do so has passed.

19
20

I.      BACKGROUND

21
22
23
24
25
26
27
28

Plaintiffs initiated this action in Nevada state court on November 21, 2019, against Scotia. (ECF No. 1-1). Scotia removed this case to this federal court in December 2019. (ECF No. 1). Plaintiffs filed an amended complaint in August 2020, adding the Barbers as parties to the action. (ECF No. 46). Defendants filed an answer and counterclaim in October 2020. (ECF No. 61).

Plaintiffs served discovery on defendants, including requests for admission ("RFAs"), on October 27, 2020. (ECF No. 71 at 2). On April 22, 2021, the court deemed these RFAs

James C. Mahan
U.S. District Judge

admitted because defendants failed to respond or otherwise participate in discovery.  (ECF No. 71).  Defendants subsequently moved this court to withdraw admissions.  (ECF Nos. 76, 77).  This motion was denied.  (ECF No. 83).

Plaintiffs now move unopposed for summary judgment and to strike defendants' counterclaims.  (*See* ECF Nos. 85, 86, 98).

a.  Undisputed Facts

The court accepts plaintiffs' statement of undisputed material facts.[1]  (*See* ECF No. 85 at 5–10).  The court also acknowledges its previous orders deeming plaintiffs' first requests for admission admitted.  (ECF Nos. 71, 83).  Thus, the court finds the following facts are not in dispute:

1.    Scotia asserted it could manufacture the equipment for one million dollars, as reflected on the equipment list Scotia provided Hybrid (ECF No. 85-1, RFA No. 1);

2.    On or about March 27, 2019, Scotia represented to Hybrid that it would take approximately 16 weeks to manufacture the items on the equipment list (ECF No. 85-1, RFA No. 2);

3.    On or about June 13, 2019, Hybrid paid Scotia $500,000 to cover its half of the costs for manufacturing of the equipment (ECF No. 85-1, RFA No. 3);

4.    Scotia proposed to Hybrid that they should purchase the Amargosa Property together as a joint venture (ECF No. 85-1, RFA No. 4);

5.    Scotia never responded with any suggested alterations or an acceptance of the written joint venture agreement that Hybrid delivered to Scotia on or about August 21, 2019 (ECF No. 85-1, RFA No. 5);

6.    On or about September 16, 2019, Hybrid requested the return of its $500,000 investment (ECF No. 85-1, RFA No. 6);

7.    As of September 16, 2019, Scotia had not yet begun manufacturing any of the equipment (ECF No. 85-1, RFA No. 7);

8.    Warren Barber represented to Johnathan Schultz in October 2019 that Scotia had begun construction of the kiln referenced in the equipment list (ECF No. 85-1, RFA No. 8);

---

[1] "If a party fails to properly support an assertion of fact or *fails to properly address another party's assertion of fact* as required by Rule 56(c), the court may consider the fact undisputed for purposes of the motion."  Fed. R. Civ. P. 56(e)(2) (emphasis added).

James C. Mahan
U.S. District Judge

9.   As of November 6, 2019, Scotia had not begun construction of the equipment (ECF No. 85-1, RFA No. 9);

10.   Scotia has never attempted to deliver any of the equipment to Hybrid (ECF No. 85-1, RFA No. 10);

11.   Scotia has never attempted to return any of the $500,000 it received from Hybrid (ECF No. 85-1, RFA No. 11);

12.   Scotia has never constructed or operated a carbon fines processing plant (ECF No. 85-1, RFA No. 12);

13.   Scotia has never provided gold to any third party that was extracted through Scotia's processing of carbon fines (ECF No. 85-1, RFA No. 13);

14.   Scotia has not lost any customers due to competition from Hybrid (ECF No. 85-1, RFA No. 14);

15.   Hybrid has not interfered with any of Scotia's contracts with third parties (ECF No. 85-1, RFA No. 15);

16.   Scotia has never operated a carbon fines processing plant (ECF No. 85-1, RFA No. 16);

17.   When Scotia received $500,000 from Hybrid, it did not have sufficient funds to invest that sum in the Hybrid-Scotia joint venture (ECF No. 85-1, RFA No. 17);

18.   Scotia did not have sufficient funds to pay for its 50% of the purchase price for the Amargosa Property between March 1, 2019, and December 1, 2019 (ECF No. 85-1, RFA No. 18);

19.   To Scotia's knowledge, Hybrid has not engaged in business with any of Scotia's customers (ECF No. 85-1, RFA No. 19);

20.   The owner of the Amargosa Property never offered to sell the Amargosa Property for less than $2 million (ECF No. 85-1, RFA No. 20);

21.   Scotia did not want to enter the joint venture with Hybrid if the carbon fines processing plant was located anywhere other than the Amargosa Property (ECF No. 85-1, RFA No. 21);

22.   Scotia has not satisfied the judgment in favor of Don David Gold because Scotia does not have the funds to do so (ECF No. 85-1, RFA No. 22);

23.   Scotia did not spend all $500,000 of Hybrid's money on the manufacture of equipment for a carbon fines processing plant (ECF No. 85-1, RFA No. 23);

24.   As of September 9, 2019, (when Warren Barber promised to pay David Swartz two $100,000 payments in exchange for a letter of authenticity for the Mandela Hands) that Scotia was under financial duress (ECF No. 85-1, RFA No. 24);

25.   Hybrid is a carbon fines processing company owned by plaintiff Johnathon Schultz (ECF No. 85 at 5–6);

26.   Schultz came into contact with Scotia and its owners, the Barbers, in 2019 when he was looking to purchase equipment to expand Hybrid's carbon fines refining business into the United

James C. Mahan
U.S. District Judge

- 3 -

States; one of Hybrid's employees had worked for a gold mining and refining business that purchased similar equipment from Scotia (ECF No. 85 at 6);

27.   Hybrid's business had been conducting carbon fines processing in South Africa for at least two years prior to the time that Schultz met the Barbers (ECF No. 85 at 6);

28.   Schultz began discussing a joint venture between Hybrid and Scotia with the Barbers, and they convinced Schultz to come to Las Vegas to see a property in Amargosa Valley, which the Barbers claimed would be perfect for carbon fines processing; the Barbers told Schultz that this property could be purchased for approximately $1–1.2 million (ECF No. 85 at 6);

29.   Schultz traveled to Las Vegas, NV, in March 2019 to meet with Warren Barber, who picked Schultz up from the airport, drove him to the property in Amargosa, and then took Schultz to his hotel (ECF No. 85 at 6);

30.   While Schultz was with Warren Barber during this trip, they negotiated and discussed the possibility of Scotia and Hybrid entering a joint venture, which would require Schultz and his family to move to Las Vegas (ECF No. 85 at 6);

31.   As the discussions continued, the Barbers told Schultz about their expensive assets, including an airplane and cabin, flew Schultz to Utah First Class, drove him around in expensive cars, and bragged about additional expensive cars that they allegedly owned; they also discussed their allegedly lucrative investments in cryptocurrency companies in the Bahamas backed by billions in gold they had on deposit in Dubai; in short, they gave Schulz the impression that Scotia, and the Barbers were successful and flush with cash (ECF No. 85 at 6);

32.   During these discussions, Warren and Max also alluded to contacts in the carbon fines industry that were supposedly in need of carbon fines processing services; however, at no time did the Barbers or Scotia ever introduce Schultz or Hybrid to any contacts or clients who were previously unknown to Schultz in the carbon fines processing industry (ECF No. 85 at 6–7);

33.   Likewise, Scotia never provided Schultz or Hybrid with any new ideas or beneficial secrets that would in any way change the way Hybrid was already processing carbon fines in South Africa; in fact, Hybrid had not changed its process for at least two years prior to Schultz's first conversations with Scotia or the Barbers (ECF No. 85 at 7);

34.   Neither Scotia nor the Barbers had anything that they could teach to Schultz or Hybrid about carbon fines processing; they provided no proprietary technology, and none of the defendants have ever owned or operated a carbon fines processing plant on which they could test any such theories (ECF No. 85 at 7);

35.   Trade secrets and confidential proprietary information were never discussed with regard to information provided by Scotia or the Barbers, because they were nowhere near as knowledgeable about carbon fines processing as Schultz; thus, neither Hybrid nor Schultz ever benefitted from, or come into contact with, any alleged proprietary technology or information originating from Scotia that provided any benefit whatsoever (ECF No. 85 at 7);

36.   Soon the parties agreed to start the carbon fines processing facility as a joint venture; the parties agreed that Scotia would manufacture the equipment, and they agreed to split the cost of both the Amargosa Property and the equipment equally (ECF No. 85 at 7);

37. The parties' discussions about a joint venture continued and Scotia represented to Hybrid that it could produce the equipment necessary for the carbon fines processing plant in approximately four months, for a total cost of $1,000,000; Scotia's equipment list provided only basic information regarding the specific components, but the parties agreed that the components listed would provide the minimum components needed to operate a carbon fines plant (ECF No. 85 at 7);

38. On June 13, 2019, to get Scotia started on the equipment expeditiously, Hybrid paid Scotia $500,000 as its one-half of the equipment cost; the money was paid before signing a formal joint venture agreement to expedite the completion of the work and the opening of the carbon fines processing plant (ECF No. 85 at 8);

39. A written, joint venture agreement was drafted and provided to Scotia, through the Barbers, for review on August 21, 2019; Scotia never accepted the agreement and never provided any revision or suggested alterations for plaintiffs' consideration (ECF No. 85 at 8);

40. On September 16, 2019, after nearly three of the four months that Scotia claimed were necessary for it to complete the manufacture of the equipment, it became clear that Scotia had not even started manufacturing the equipment; thus, Schultz sent an email to Scotia demanding the return of the $500,000 payment since it appeared that no work had begun. Schultz sent this email due to the ongoing delays and misrepresentations made by Scotia (ECF No. 85 at 8);

41. Scotia claimed that it was manufacturing the equipment, and Max responded by saying that Hybrid could not unwind the deal because there was a "meeting of the minds" as evidenced by Hybrid's $500,000 payment; this was just another lie by Max Barber made in furtherance of his desire to delay our recovery of Scotia's money, a fact proven by the Barbers' failure to take any action in furtherance the parties' joint venture following Scotia receipt of Hybrid's $500,000 (ECF No. 85 at 8);

42. In October 2019, Warren attempted to convince Hybrid that Scotia was nearly finished manufacturing the kiln; the kiln would have accounted for approximately 15-20% of the equipment needed to operate the carbon fines processing business, so it would have been a good start even at this late date (ECF No. 85 at 8);

43. Scotia and the Barbers never had any intention of conducting themselves as legitimate joint venture partners, and on November 6, 2019, Scotia's employee, Scott Adams, met with Schultz in Las Vegas and revealed that Scotia had not even started manufacturing the equipment needed for a carbon fines processing plant because Scotia could not come up with any money to buy the equipment or buy land on which to build such a facility (ECF No. 85 at 8–9);

44. The following day, Schultz's counsel sent a letter to Scotia demanding that it immediately cease work and return the $500,000 or any remaining portion along with a detailed accounting regarding how the converted funds were spent (ECF No. 85 at 9);

45. As of September 23, 2021, Scotia has not returned any portion of the $500,000 paid by Hybrid, has not provided an accounting of how the converted funds were spent, and has not provided any evidence that it spent even one of the one-half million dollars for any purposes that may have benefited the joint venture (ECF No. 85 at 9);

James C. Mahan
U.S. District Judge

- 5 -

46.   Instead of demonstrating loyalty to the joint venture, the Barbers sought to convert 100% of Scotia's equipment payment for their own purposes in violation of the terms of the parties' verbal agreement, in breach of the Barbers' fiduciary duties, and in conscious disregard of the damages caused by their malicious, oppressive, and otherwise despicable conduct (ECF No. 85 at 9);

47.   Given the failure to obtain the carbon fine processing equipment, Hybrid ended up abandoning the carbon fines processing plans; although the company still handles some refining processes through third parties, Hybrid has not operated a carbon fines plant anywhere other than South Africa, where Hybrid continues to do business in the same manner it did prior to its introduction to the Barbers (ECF No. 85 at 9);

48.   Neither Hybrid nor Schultz have conducted any carbon fines processing within the continental United States, and it is therefore impossible for Hybrid to misappropriate any customers or any trade secrets because Hybrid is not in competition with Scotia; indeed, even if Scotia had some trade secrets or a proprietary list of customers, Hybrid has not and could not realize any benefit from such information (ECF No. 85 at 9); and

49.   At no time since the parties' discussions in 2019 have either Schultz or Hybrid interfered with any of Scotia's contracts with third parties, engaged in any business with any of Scotia's customers, or taken any other action that in any way was damaging to Scotia's business (ECF No. 85 at 9–10).

## II.   LEGAL STANDARDS

### a.   Motion to Strike

A defendant—or, as here, a counter-defendant—may move to dismiss a claim for failure of prosecution, noncompliance with the Federal Rules of Civil Procedure, or noncompliance with a court order.  Fed. R. Civ. P. 41(b).

In determining whether to dismiss a claim pursuant to Rule 41(b), the court must weigh the following factors: (1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its docket; (3) the risk of prejudice to defendants/respondents; (4) the availability of less drastic alternatives; and (5) the public policy favoring disposition of cases on their merits.  *Pagtalunan v. Galaza,* 291 F.3d 639, 642 (9th Cir. 2002) (citing *Ferdik v. Bonzelet,* 963 F.2d 1258, 1260 (9th Cir. 1992)).

. . .

James C. Mahan
U.S. District Judge

b.  Motion for Summary Judgment

The Federal Rules of Civil Procedure allow summary judgment when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims . . . ."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

For purposes of summary judgment, disputed factual issues should be construed in favor of the non-moving party.  *Lujan v. Nat'l Wildlife Fed*., 497 U.S. 871, 888 (1990).  However, to be entitled to a denial of summary judgment, the non-moving party must "set forth specific facts showing that there is a genuine issue for trial."  *Id.*

In determining summary judgment, the court applies a burden-shifting analysis.  "When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial."  *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc*., 213 F.3d 474, 480 (9th Cir. 2000).  Moreover, "[i]n such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case."  *Id.*

If the moving party satisfies its initial burden, the burden then shifts to the opposing party to establish that a genuine issue of material fact exists.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties'

James C. Mahan
U.S. District Judge

- 7 -

differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

At summary judgment, a court's function is not to weigh the evidence and determine the truth, but to determine whether a genuine dispute exists for trial. *See Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 249 (1986). The evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. But if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50.

The Ninth Circuit has held that information contained in an inadmissible form may still be considered for summary judgment if the information itself would be admissible at trial. *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003) (citing *Block v. City of Los Angeles*, 253 F.3d 410, 418-19 (9th Cir. 2001) ("To survive summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial, as long as the party satisfies the requirements of Federal Rules of Civil Procedure 56.")).

Pursuant to Local Rule 7-2(d), an opposing party's failure to file a timely response to any motion constitutes the party's consent to the granting of the motion and is proper grounds for dismissal. A court cannot, however, grant a summary judgment motion merely because it is unopposed, even where its local rules might permit it. *Henry v. Gill Indus., Inc.*, 983 F.2d 943, 949-50 (9th Cir. 1993); *see also Martinez v. Stanford*, 323 F.3d 1178, 1182 (9th Cir. 2003) (a district court cannot grant a motion for summary judgment based merely on the fact that the opposing party failed to file an opposition).

Even without an opposition, the court must apply standards consistent with Rule 56, determining if the moving party's motion demonstrates that there is no genuine issue of material

James C. Mahan
U.S. District Judge

- 8 -

1   fact and judgment is appropriate as a matter of law.  *Henry*, 983 F.2d at 950; *see also Clarendon*

2   *Am. Ins. Co. v. Jai Thai Enters., LLC*, 625 F. Supp. 2d 1099, 1103 (W.D. Wash. 2009).[2]

3   **III.   DISCUSSION**

4

5       **a.   Motion to Strike**

6       Plaintiffs' instant motion to strike (ECF No. 98) moves this court to strike defendants'

7   counterclaims pursuant to Rule 41(b) for failure to prosecute as well as noncompliance with both

8   the Federal Rules of Civil Procedure and a court order.  Defendants filed their counterclaims on

9   October 8, 2020.  (ECF No. 61).  Since then, in nearly two years, no further action has been

10   taken to pursue these claims.

11

12       Defendants' lack of substantial action has resulted in noncompliance with orders, as well

13   as undue delay in progress of this litigation.  (*See, e.g.*, ECF Nos. 92, 95).  Plaintiffs have

14   expended time and resources answering the unpursued counterclaims and attempting to carry out

15   this litigation nearly entirely one sided.  The court has an inherent power to manage its own

16   docket, which—as plaintiffs mention—is difficult to do without both sides' cooperation.  *Ready*

17   *Transp., Inc. v. AAR Mfg., Inc.*, 627 F.3d 402, 404 (9th Cir. 2010); (*see* ECF Nos. 92, 95).

18

19       This court finds each of the five factors in favor of striking defendants' counterclaims.

20   *See Pagtalunan,* 291 F.3d at 642 (citing *Ferdik*, 963 F.2d at 1260).  The public's interest in

21   expeditious resolution of litigation is offended by defendants' lack of action causing undue delay

22   in this matter.  This court should not have to spend time repeatedly addressing a party's lack of

23   participation.  Plaintiffs will be—and have been—prejudiced by having to engage in excessive

24   motion practice and litigate against claims that defendants have apparently, without notice,

25

26

---

27       [2] "[S]ummary judgment cannot be granted by default, even if there is a complete failure

28   to respond to the motion."  Fed. R. Civ. P. 56, 2010 cmt. to subdivision (e).  The court may only grant summary judgment if "the motion and supporting materials . . . show that the movant is entitled to it." Fed. R. Civ. P. 56(e).

chosen not to pursue.   There are no less drastic alternatives to striking the counterclaims; defendants' only action to pursue them was filing them.   Finally, though public policy favors disposition of cases on their merits, the merits cannot be determined here without defendants' pursuit of same.

Thus, this court finds that defendants' counterclaims may be, and are, STRICKEN.

b.   Motion for Summary Judgment

1.   *Breach of Contract (Scotia)*

To prevail on their breach of contract claim, plaintiffs must prove (1) a valid and enforceable contract existed; (2) their own performance or excusal thereof; (3) defendant's material breach; and (4) damages.   *Calloway v. City of Reno*, 993 P.2d 1259, 1263 (Nev. 2001); *see also Sierra Dev. Co. v. Chartwell Advisory Group, Ltd.*, 223 F. Supp. 3d 1098, 1103 (D. Nev. 2016).

"Basic contract principles require, for an enforceable contract, an offer and acceptance, meeting of the minds, and consideration."   *May v. Anderson*, 121 Nev. 668, 672 (2005) (citing *Keddie v. Beneficial Ins., Inc.*, 94 Nev. 418, 421 (1978) (Batjer, C.J., concurring)).   "A contract can be formed, however, when the parties have agreed to the material terms, even though the contract's exact language is not finalized until later."   *Id.* (citing *Higbee v. Sentry Ins. Co.*, 253 F.3d 994, 998 (7th Cir. 2001)).

The parties agreed to enter a joint venture contract at Scotia's suggestion.   (ECF Nos. 85 at 7; 85-1, RFA No. 4).   There is consideration here: plaintiffs agreed to pay half the cost of the venture, and Scotia agreed to pay the other half as well as to manufacture equipment.   (ECF No. 85 at 7).   Moreover, Scotia accepted Hybrid's performance of the contract.   (ECF Nos. 85 at 8;

James C. Mahan
U.S. District Judge

- 10 -

85-1, RFA No. 3).  It is clear both parties intended to enter into the contract, and thus there was a meeting of the minds.  A valid and enforceable contract existed between the parties.

Here, the material terms are unambiguous: the parties agreed to split the $1,000,000 cost of equipment and Amargosa property, and Scotia agreed to manufacture the equipment.  (ECF Nos. 85 at 7–8; 85-1, RFA Nos. 1, 3).  Even though the final, written joint venture agreement was never signed, the parties orally agreed to material terms (*e.g.*, timeline, cost).  (ECF Nos. 85 at 7–8; 85-1, RFA No. 5).  Scotia materially breached the agreement when it failed to manufacture the equipment.  (*See* ECF Nos. 85 at 8–9; 85-1, RFA No. 12).  Moreover, plaintiffs suffered damages when Scotia refused to return the $500,000.  (*See* ECF Nos. 85 at 9; 85-1, RFA Nos. 6, 11).

Thus, because the undisputed facts show (1) a valid and enforceable contract between Hybrid and Scotia existed, (2) Hybrid performed, (3) Scotia materially breached, and (4) Hybrid suffered damages, plaintiffs' motion for summary judgment as to breach of contract is GRANTED.

### 2.   Breach of Implied Covenant of Good Faith and Fair Dealing (Scotia)

"It is well established that all contracts impose upon the parties an implied covenant of good faith and fair dealing, which prohibits arbitrary or unfair acts by one party that work to the disadvantage of the other."  *Nelson v. Heer*, 123 Nev. 217, 226 (2007).  The purpose of the claim is to prevent a contracting party from "deliberately counterven[ing] the intention and spirit of the contract."  *Morris v. Bank of Am. Nev.*, 886 P.2d 454, 457 (Nev. 1994) (internal quotation marks omitted).

To state a claim for breach of the implied covenant of good faith and fair dealing, a plaintiff must allege (1) plaintiff and defendant were parties to a contract; (2) defendant owed a

duty of good faith the plaintiff; (3) defendant breached that duty by performing in a manner that was unfaithful to the purpose of the contract; and (4) plaintiff's justified expectations were denied. *See Hilton Hotels v. Butch Lewis Prods.*, 808 P.2d 919 (Nev. 1991).

Scotia and Hybrid were parties to a contract and owed each other a duty of good faith and fair dealing pursuant to Nevada law. *See Nelson*, 123 Nev. at 226; discussion *supra* section III.b.1. Scotia failed to use Hybrid's $500,000 payment for contractual purposes. (ECF Nos. 85 at 9; 85-1, RFA No. 23). Moreover, contrary to reality, Scotia avowed its familiarity with the carbon fines processing industry, access to proprietary technology, and the capacity to introduce new clientele to Hybrid. (ECF Nos. 85 at 6–7; 85-1, RFA No. 12). Scotia's assertions justified Hybrid's expectations of Scotia's performance under the contract.

Hybrid eventually realized Scotia's dishonesty about its ability to perform under the contract, and it requested an accounting and return of its money. (ECF Nos. 85 at 8–9). Scotia refused and continued to assert it would be able to complete its portion of the contract. (ECF Nos. 85 at 8–9; 85-1, RFA No. 11). Scotia retaining Hybrid's $500,000 payment while failing to even attempt to perform under the contract was contrary to Hybrid's expectations. (ECF Nos. 85 at 6; 85-1, RFA Nos. 7, 8, 11). It stripped Hybrid—and Scotia—of the opportunity to profit and expand business under the contract, offending the purpose and spirit of the contract. Thus, Scotia breached the implied covenant of good faith and fair dealing.

Plaintiffs' motion as to breach of covenant of good faith and fair dealing is GRANTED.

### 3. *Unjust Enrichment (All Defendants)*

Under Nevada law, unjust enrichment is an equitable doctrine that allows recovery of damages "whenever a person has and retains a benefit which in equity and good conscience belongs to another." *Unionamerica Mortgage & Equity Trust v. McDonald*, 626 P.2d 1272,

1273 (Nev. 1981); *see also Asphalt Prods. v. All Star Ready Mix*, 898 P.2d 699, 701 (Nev. 1995). However, where there is an express contract, an unjust enrichment claim is unavailable. *Leasepartners Corp. v. Robert L. Brooks Trust Dated November 12*, 1975, 942 P.2d 182, 187 (Nev. 1997).

Here, an express, valid, and enforceable contract existed between Hybrid and Scotia. Plaintiffs cannot recover from Scotia under both breach of contract and unjust enrichment. *See Leasepartners*, 942 P.2d at 187.

Further, the only benefit conferred to defendants was the $500,000 Hybrid gave to Scotia pursuant to the Hybrid-Scotia contract. (*See* ECF Nos. 85 at 8; 85-1, RFA No. 3). The Barbers, notably, were not individual parties to this contract and thus have not retained a benefit beyond what was provided to Scotia. Because the Barbers did not "retain a benefit which in equity and good conscience belongs to another," plaintiffs are not entitled to judgment as a matter of law in this instance. *See McDonald*, 626 P.2d at 1273.

Thus, plaintiffs' motion for summary judgment with respect to its unjust enrichment claim is DENIED.

### 4. Intentional Misrepresentation (All Defendants)

Intentional misrepresentation is established by: (1) a false representation that is made with either knowledge or belief that it is false or without a sufficient foundation, (2) an intent to induce another's reliance, and (3) damages that result from this reliance. *Nelson*, 123 Nev. at 220 (citing *Collins v. Burns*, 103 Nev. 394, 397 (1987)). False representation includes suppression or omission. *Id.*

Here, defendants asserted they were able to fund half of the venture as well as manufacture the equipment needed for $1,000,000 in approximately 16 weeks. (ECF Nos. 85 at

7; 85-1, RFA No. 1, 2).  But defendants were unable to finance the venture.  (ECF Nos. 85 at 8–9; 85-1, RFA No. 17).  Thus, they knew, or should have known, asserting their ability to fund operations and manufacture equipment was false.  Defendants made these representations with the intention plaintiffs would rely on them and pay defendants the $500,000 under their contract.  (*See* ECF No. 85 at 8–9).

Thus, plaintiffs' motion for summary judgment with respect to its intentional misrepresentation claim is GRANTED.

### 5.  *Negligent Misrepresentation (All Defendants)*

Plaintiffs voluntarily dismiss their claim for negligent misrepresentation.  (ECF No. 85 at 13, n.1).  Without opposition from defendants, plaintiffs' claim for negligent misrepresentation may be, and hereby is, DISMISSED.  *See* LR 7-2(d) ("The failure of an opposing party to file points and authorities in response to any motion…constitutes a consent to the granting of the motion.").

### 6.  *Defendants' Counterclaims*

Defendants assert nine counterclaims:  (1) fraud/intentional misrepresentation;  (2) negligent misrepresentation;  (3) misappropriation of trade secrets;  (4) misappropriation of property;  (5) intentional interference with contractual relations;  (6) intentional interference with prospective contractual relations;  (7) extortion;  (8) breach of contract; and  (9) breach of the duty of good faith and fair dealing.  Each of these claims are stricken.  *See* discussion *supra*, section III.a.

Thus, plaintiffs' motion for summary judgment as to defendants' counterclaims is DENIED as moot.

. . .

James C. Mahan
U.S. District Judge

**IV.     CONCLUSION**

Accordingly, and pursuant to the foregoing,

IT IS HEREBY ORDERED, ADJUDGED, and DECREED that plaintiffs' motion to strike defendants' counterclaims (ECF No. 98) be, and the same hereby is, GRANTED.

IT IS FURTHER ORDERED that plaintiffs' motion for summary judgment (ECF No. 85) be, and the same hereby is, GRANTED in part and DENIED in part. Plaintiff's motion as to (1) breach of contract, (2) breach of good faith and fair dealing, and (3) intentional misrepresentation is GRANTED. Plaintiffs' motion as to unjust enrichment is DENIED. Plaintiffs' motion as to defendants' counterclaims is DENIED as moot.

IT IS FURTHER ORDERED that Plaintiffs' claim of negligent misrepresentation is DISMISSED.

DATED September 21, 2022.

UNITED STATES DISTRICT JUDGE

James C. Mahan
U.S. District Judge

- 15 -